DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Erie County Court of Common Pleas, in which the trial court granted partial summary judgment to appellees, Put-In-Bay Boat Line Co., et al., and dismissed a portion of the complaint filed by appellants, Island Express Boat Lines, Ltd., et al. On appeal, appellants set forth the following six assignments of error:
 {¶ 2} "First Assignment of Error: Defendants-Appellees' ferryboat service, the Jet Express, consistently charged double the fare charged by Miller Boat Line for passenger ferry service to Put-in-Bay. The Jet Express could charge twice as much as Miller Boat Line because the Jet Express, like Plaintiffs-Appellants' ferryboat service, the Rocket, offered high-speed service, late-night service, and downtown service. Miller Boat Line did not offer any of those services. Federal courts have held that, for purposes of an antitrust analysis, even identical products can belong to different markets if there is a significant price differential between the products. Therefore, the trial court erred in holding as a matter of law that, for antitrust purposes, Miller Boat Line was part of the same relevant market as the Jet Express and the Rocket, although Miller Boat Line provided a substantially different service at a significantly lower price.
 {¶ 3} "Second Assignment of Error: Within three days after Todd Blumensaadt had been hired to run the Jet Express, a company he controlled paid $60,000 to lease the ferryboat dockage at Ladd's marina, causing the Rocket to be evicted from its dockage. Blumensaadt never used the dockage at Ladd's Marina for any purpose. Courts have held that an important element in determining whether a common design to engage in an *Page 3 
antitrust conspiracy exists is evidence of business decisions, which if taken independently, would be against the actor's economic self-interest. Because Blumensaadt's actions made no economic sense independent of an antitrust conspiracy, the trial court erred in granting Defendants-Appellees' motion for summary judgment on Plaintiffs-Appellants' claim for antitrust conspiracy.
 {¶ 4} "Third Assignment of Error: The Antitrust Defendants engaged in predatory conduct in obtaining the eviction of the Rocket from Ladd's Marina, and also by refusing to lease dockage to the Rocket. Their purpose was to monopolize the market for late-night-high-speed-ferryboat service to downtown Put-in-Bay. The Antitrust Defendants now control 100% of the market for late-night-high-speed ferryboat service to downtown Put-in-Bay. Therefore, the trial court erred in granting Defendants-Appellees' motion to dismiss Plaintiffs-Appellants' claims for attempted monopolization and monopolization.
 {¶ 5} "Fourth Assignment of Error: Plaintiffs-Appellants moved for a preliminary injunction in the Ottawa County Common Pleas Court in a related matter. In granting the injunction, the court applied the standard for granting a preliminary injunction, although it termed the injunction a `final' injunction. Because the court applied the standard for a preliminary injunction, the injunction was not a final injunction, and not a final order. Therefore, the trial court erred in holding that the preliminary injunction issued by the Ottawa County Common Pleas Court had collateral estoppel effect in this matter. *Page 4 
 {¶ 6} "Fifth Assignment of Error: Because Todd Blumensaadt tortiously interfered with Plaintiffs-Appellants' business relationship with Ladd's Marina by encouraging the Ladds to evict the Rocket from its dockage at Ladd's Marina, the trial court erred by holding that Plaintiffs-Appellants could not state a claim for tortious interference with a business relationship.
 {¶ 7} "Sixth Assignment of Error: Ohio courts have recognized that a business can have a prospective relationship with its customers and that this prospective relationship is protected from tortious interference. Because Ladd's Marina tortiously interfered with the Rocket's business relationship with its extensive customer base by maliciously evicting the Rocket from its dockage for the sole purpose of driving the Rocket out of business, the trial court erred in holding that Ladd's Marina did not tortiously interfere with the Rocket's business relationship with its customers.
 {¶ 8} The relevant, undisputed facts are as follows. Appellants, Island Express Boat Lines, Ltd.; Island Rocket III, LLC; Kevin Baxter; Andrew S. Martin; Duane C. Ohly; and Joseph C. Fratoe (collectively "Island Express"), were the owners/operators of a passenger ferryboat service running between Sandusky, Ohio, Port Clinton, Ohio, and the town of Put-in-Bay on South Bass Island. Appellees, Bernard M. McCann; Charles L. Duggan; Marvin E. Booker; George R. Stoiber; Todd A. Blumensaadt; Put-in-Bay Boat Line Company; and First Island Company ("Jet owners"), either own, invest in, or operate a separate ferryboat service from Port Clinton to Put-in-Bay, or own marinas and/or dock space on South Bass Island. Other parties in this case include Shawn Ladd, *Page 5 
Christopher J. Ladd, and Ladd's Marina, Inc. ("Ladds"); and PIB Ventures, LLC, and Put-in-Bay Investments, Ltd. ("PIB").
 {¶ 9} Sometime in 1990, the Jet owners began a ferryboat service, the Jet Express, which offered high-speed ferryboat service for up to 400 passengers at a time from the North Jefferson Street pier in Port Clinton to downtown Put-in-Bay. In addition to ferrying passengers in the daytime, the Jet Express offered service to Put-in-Bay into the evening hours.
 {¶ 10} In 1997, appellants, Erie County Prosecutor, Kevin Baxter, and local businessman, Duane Ohly, along with several other Island Express investors, purchased a single, open-hulled boat named Rocket I. Rocket I was capable of taking up to 149 passengers from downtown Sandusky to downtown Put-in-Bay. Like the Jet Express, the Rocket offered high-speed ferryboat service to Put-in-Bay, both during the day and at night. Later, Island Express purchased another vessel, the Rocket II. In 2002, a third vessel, Rocket III, was purchased by Island Rocket III, LLC, an entity formed by Island Express specifically for that purpose.[1]
 {¶ 11} Also offering ferryboat service to Put-in-Bay was Miller Boat Line, a company in existence for years prior to either the Jet Express or the Rocket. Miller charged approximately one-half as much fare as either the Jet Express or the Rocket, and used much bigger vessels to take passengers from Catawba Island to a location just *Page 6 
outside of Put-in-Bay. From that point, transportation into town was available. Even though Miller's boats were slower than either the Jet Express or Rockets I, II, and III, they traveled a short distance and, therefore, made the trip in a much shorter time. Miller's boats operated only during the daylight hours.
 {¶ 12} Initially, the Rocket docked at Fox's Marina in downtown Put-in-Bay, which was owned by appellee Charles "Skip" Duggan. However, in 1998, Island Express began leasing dock space from nearby Ladd's Marina. In 2002, Island Express expanded its business by leasing the North Jefferson Street pier, which became available after the Jet Express moved its operation to another location in the city of Port Clinton. During this same time, Island Express purchased Rocket II and Rocket III, and made arrangements with another company, Hornblower Marine Services, to lease yet another vessel, the Zephyr.
 {¶ 13} In March 2002, the Ladds drafted and submitted to Island Express a five-year lease agreement, pursuant to which Island Express agreed to pay the Ladds $30,000 per year. The lease was signed by representatives of Island Express, but the Ladds never returned a signed copy of the lease. Nevertheless, in early 2003, Island Express paid for improvements to both the North Jefferson Street pier and the dock at Ladd's Marina.
 {¶ 14} Due to its acquisition of new vessels and the expenditure of funds for expansion, Island Express failed to make a profit after 2000.[2] On May 28, 2003, Baxter and Ohly met with Todd Blumensaadt, the newly appointed general manager of the Jet *Page 7 
Express, at the Outback Steakhouse in Sandusky, Ohio, to discuss the possibility of selling the business. During the meeting, Baxter told Blumensaadt that the Ladds never signed a copy of the five-year lease.
 {¶ 15} Later that same night, Blumensaadt requested a meeting with Shawn Ladd, during which the two men discussed the status of the lease between Island Express and the Ladds. Two days later, Shawn and his mother, Vivienne Ladd, executed a "temporary" lease with Blumensaadt's newly-formed company, PIB Ventures, for the dock space at Ladd's Marina that was being used by Island Express. The lease term ran from May 29, 2003, until May 29, 2008. After the lease was executed, Blumensaadt gave the Ladds a check for $60,000, drawn on PIB Ventures' bank account. That same day, the Ladds sent a letter to Island Express, in which they stated the lease agreement between Island Express and Ladd's Marina was terminated as of June 1, 2003.
 {¶ 16} On June 5, 2003, Island Express filed a complaint and a motion for preliminary and permanent injunction against Ladds in the Ottawa County Court of Common Pleas, which set forth claims for breach of oral and written contract, promissory estoppel, tortious interference with prospective business, and fraud. On June 6, 2003, a hearing was held on the request for an injunction.
 {¶ 17} At the outset of the hearing, the trial court consolidated Island Express's motions for preliminary and permanent injunctions pursuant to Civ.R. 65(B)(2). On June 12, 2003, the trial court filed a decision and order in which it found that, while the lease was written by the Ladds and signed by Island Express, it was never signed by Ladds; *Page 8 
therefore, Island Express had only a year-to-year, oral lease for dock space at Ladd's Marina. The trial court further found that Island Express would be irreparably harmed if injunctive relief was not granted; Island Express had a "substantial likelihood of success on the merits" of its case against the Ladds, and Island Express established by clear and convincing evidence that it was "entitled to a Preliminary and Final Injunction" prohibiting the Ladds from denying Island Express dock space until October 31, 2003. Thereafter, the Ladds complied with the trial court's order, but stated that Island Express could not lease the dock after the end of the 2003 boating season.
 {¶ 18} During the remainder of the 2003 season, Island Express made several futile attempts to secure alternate dock space for 2004. Those attempts included seeking permission to lease Put-in-Bay's municipal docks, which was opposed by several council members and the town's mayor, Bernard "Mack" McCann. In addition, Island Express tried to rent dock space from Miller Ferry, but was refused. Because it was unable to lease dock space after October 2003, Island Express could not assure its investors that it would ever become profitable. As a result, Island Express's funding dried up, and it was forced out of business. The company's assets, which included Rockets I, II and III, were sold at a substantial loss.
 {¶ 19} Island Express dismissed its complaint in the Ottawa County Court of Common Pleas in early December 2003. On December 10, 2003, Island Express filed a *Page 9 
separate complaint in the Erie County Court of Common Pleas,[3] which set forth the following claims:
 {¶ 20} Count 1: Creation of an unlawful trust by the Jet owners, in violation of R.C. 1331.01.
 {¶ 21} Count 2: Anticompetitive conduct by the Jet owners, in an attempt to monopolize the market for high-speed-late-night ferryboat service to Put-in-Bay.
 {¶ 22} Count 3: Acquisition of illegal monopoly power by the Jet owners when they entered into the temporary lease with Ladd's Marina.
 {¶ 23} Count 4: The Jet owners' act of combining "capital, skill, or acts for the purpose of creating or carrying out restrictions in trade or commerce in violation of R.C. 1331.01(B)(1) * * *."
 {¶ 24} Count 5: The Jet owners' act of engaging in an unlawful antitrust conspiracy by leasing Ladd's Marina and causing Island Express's lease to be terminated.
 {¶ 25} Count 6: The Ladds' breach of the lease contract when they terminated the March 2002 lease.
 {¶ 26} Count 7: Tortious interference on the part of Jet owners and PIB with the March 2002 lease between Island Express and the Ladds.
 {¶ 27} Count 8: Tortious inference by the Ladds, PIB, and the Jet owners with the business relationship between the Rocket and its customer base. *Page 10 
 {¶ 28} Count 9: Promissory estoppel as to the terms of the March 2002 lease between Island Express and Ladds, which was subsequently breached by the Ladds.
 {¶ 29} Count 10: Shawn Ladd's negligent misrepresentation that he had signed the March 2002 lease when, in fact, he had not.
 {¶ 30} Count 11: Formation of a civil conspiracy by the Jet owners, the Ladds, and PIB, to deny the Rocket access to any dock space at Put-in-Bay.
 {¶ 31} On February 12, and February 17, 2004, respectively, the Jet owners and the Ladds filed motions to change venue, in which they asked the Erie County Court of Common Pleas to transfer the case back to Ottawa County. Island Express filed a response in opposition to a change of venue on February 26, 2004. The request to change venue was denied on May 15, 2004.
 {¶ 32} On September 7, 2004, Island Express filed a motion in the Erie County Court of Common Pleas to consolidate that case with the case filed in Ottawa County. The Jet owners, PIB and the Ladds filed separate responses in opposition to Island Express's request. On December 8, 2004, the trial court summarily denied the request for consolidation of the two cases.
 {¶ 33} On September 6, and September 9, 2005 the Jet owners, PIB, and the Ladds filed respective motions for summary judgment, along with supporting memoranda. On October 6, 2005, Island Express filed a memorandum in opposition to summary judgment. All parties submitted copious amounts of documentation and/or other evidence in support of their respective claims. *Page 11 
 {¶ 34} In support of their motion for summary judgment, the Jet owners relied on the deposition testimony of Todd Blumensaadt, William Blumensaadt, Charles "Skip" Duggan, Shawn Ladd, Christopher Ladd, Marvin Booker, and Bernard "Mack" McCann.
 {¶ 35} Todd Blumensaadt testified in a deposition on February 15, 2005, that he became the manager of the Jet Express after purchasing PIB Boat Line stock for $30,000, and First Island Company stock (which owns the Jet Express vessels) for $1 million. Todd testified that he made a $200,000 down payment, and borrowed the rest of the $1 million purchase price from the seller, Skip Duggan. The loan was to be repaid at the rate of $70,000 per year, with a balloon payment at the end of five years. Coincidentally, Todd's company, PIB Investments, was hired to manage the Jet Express for five years, with an annual compensation of $70,000 per year, plus a "performance bonus."
 {¶ 36} Todd further testified that the purpose of the Jet Express is to bring as many people to Put-in-Bay as possible, so they can patronize businesses on South Bass Island, most of which are owned and/or controlled by the Jet Express owners. Todd stated that the Jet Express charged passengers more than Miller because it offered late-night service and a narrated tour of the Lake Erie Islands. Todd further stated that all boat lines in the area are in competition with each other, and all experienced a "falling off in business in recent years.
 {¶ 37} As to the lease with the Ladds, Todd testified he signed a "temporary lease" in June 2003, and tendered a $60,000 check, which was not cashed. The purpose of the lease was to allow Todd to start his own ferryboat line. Todd stated that he gave the *Page 12 
Ladds a replacement check in December 2003, after the injunction was issued, which was cashed. He stated the $60,000 came from a combination of personal funds and funds from his business ventures, PIB Investments and PIB Ventures — not from the Jet owners. Todd testified that the Ladds owed PIB Investments $28,000 in May 2003, and that the debt, which was for landscaping services, was never repaid. He further stated that he made no lease payments to the Ladds after the initial $60,000 payment in December 2003.
 {¶ 38} In a second deposition given on September 16, 2005 (after the motion for summary judgment was filed), Todd testified that PIB Investments was hired by the Jet owners to provide construction and landscaping services and to refurbish boat hulls. He further testified that a $200,000 "performance bonus" was to be paid to PIB Investments upon completion of the five-year agreement in 2008. Todd testified that the temporary lease was to be for five years; however, the Ladds were only paid for the first two years. Todd stated he never used the dock to start his own ferryboat service because of the litigation in Ottawa County, and the Ladds never repaid the $60,000.
 {¶ 39} William "Bill" Blumensaadt, Todd's brother, testified in his deposition that he was the manager of Jet Express from 1989 until the fall of 2003. Bill further testified that after 2002, the Jet Express experienced a drop-off in business, perhaps due to the weather or the economy. He stated that Rocket III often carried "overflow" from the Jet Express out of Port Clinton. *Page 13 
 {¶ 40} Bill testified that the Jet Express was not created to be profitable; however, the Jet owners were always concerned about competition, whether it was from the Rocket, Miller, or other ferryboat lines. He further stated the Jet owners considered Miller to be "major competition" because Miller's fares were cheaper, it had a big advertising budget, and its boats carried more passengers to Put-in-Bay in a shorter time than the Jet Express. Bill testified that in 1998, the Jet owners purchased another ferryboat, the Island Hopper, to eliminate additional competition. He also testified that the Jet owners were aware that Hornblower was entering ferryboat markets all over the country.
 {¶ 41} Charles "Skip" Duggan testified in his deposition that he started the Jet Express, along with McCann, Stoiber, and Booker, as a way to get more visitors to Put-in-Bay Island. Duggan stated that in 2002, he announced that he was stepping down as president of the Jet Express, after being diagnosed with cancer. Duggan stated that, in addition to his past ownership in the Jet Express, he is the owner of Fox's Dock in downtown Put-in-Bay, which he leased to Island Express in 1997. However, Duggan terminated the lease one year later because Island Express did not make lease payments on time.
 {¶ 42} Duggan testified that he sold his interest to Todd Blumensaadt, who agreed to pay Duggan $70,000 per year. Duggan further testified that Todd draws a $70,000 per year salary as manager of Jet Express. Duggan stated that, in his opinion, the Rocket takes "very little" business away from the Jet Express and, therefore, it is "not really" a *Page 14 
competitor of the Jet Express. He further stated the Jet owners had to purchase faster boats in order to "beat" Miller's time to Put-in-Bay and that Miller is capable of running ferryboat service to the island later into the season than either the Jet Express or the Rocket. He also stated that the Jet owners had no real interest in purchasing Island Express in 2003, and he did not know if Jet Express fares increased after the Rocket went out of business.
 {¶ 43} Shawn Ladd testified in his deposition that the Ladd family owns Ladd's Marina and Ladd's Restaurant on Put-in-Bay. Shawn further testified that he leased dock space to Island Express in 1998, for $12,000 per year plus seven percent of gross revenues. That written lease was signed; however, subsequent leases in 1999 and 2000 were not signed by either party. Shawn testified that he prepared a written, five-year lease in 2002, pursuant to which Island Express agreed to install a floating dock and to pay Ladd's Marina $28,000 per year. Shawn stated that he was not "overly happy" with Island Express's performance under the 2002 lease, mainly because of untimely lease payments and unruly passengers on the dock at night. Shawn further stated he thought that, without a signed lease, he could "throw [the Rocket] out" at any time. Consequently, when the Rocket's manager, William Annand, inquired as to whether the lease would be signed, Shawn said he did not want to sign the lease "yet."
 {¶ 44} Shawn testified that, after the May 28, 2003, meeting with Baxter and Ohly, Todd Blumensaadt called Shawn to arrange a meeting. Todd told Shawn that Island Express wanted to sell the Rocket, and it did not care if the Ladds got hurt by the sale. *Page 15 
After talking to Todd, Shawn and his brothers decided to unilaterally terminate Island Express's lease. Shortly thereafter, Shawn and his mother, Vivienne Ladd, met with Todd and signed the temporary five-year lease. The lease with Island Express was terminated the next day. Shawn further testified he was aware that, after the lease was terminated, Island Express unsuccessfully attempted to rent dock space from Duggan and Miller. Shawn also stated that John Wagner, the owner of Hornblower, asked the Ladds for dock space; however, the Ladds did not want to let the Zephyr dock at their marina because of its association with the Rocket.
 {¶ 45} Marvin Booker, owner of the Boardwalk and one of the Jet owners, testified that he was also the former owner of the Crew's Nest, a private club and marina which he later sold to McCann. Booker also testified that the Jet Express and the Rocket were "rivals;" however, the Jet's strongest competition was from Miller Boat Line. Consequently, the Jet Express stressed late-night and high-speed service in it advertisements to the public. Booker also stated that when he was contacted by Annand after the 2003 lease was terminated, Booker told Annand he would lease to ferryboats coming from Sandusky, but not Port Clinton. Booker then told Annand to contact Todd Blumensaadt about leasing Ladd's Marina. Booker testified he heard "rumors" that the Ladds owed Todd's company $28,000. He also stated that Wagner's request to dock the Zephyr at the Boardwalk was refused because the 90-foot vessel was too big.
 {¶ 46} Christopher Ladd testified that he met with Todd Blumensaadt on May 28, 2003, soon after Todd met with Shawn Ladd. At that meeting, Todd told Christopher that *Page 16 
Island Express might be ready to "bail out" of its lease with the Ladd's. After meeting with Todd, the Ladd brothers decided to terminate the lease. Christopher stated Todd was interested in renting Ladd's Marina to start his own ferryboat business; however, no such business was ever started. Christopher further stated that other docks were available in 2003 and 2004, including Fox's [Duggan's] Dock, three municipal docks, the Boardwalk, which is owned by Booker, the Crew's Nest, which is controlled by McCann, and docks owned by the Miller Boat Line.
 {¶ 47} Mack McCann testified that, at all times relevant to this case, he was both mayor of Put-in-Bay and a major shareholder in the Jet Express. McCann stated he was vice president of the Jet Express from 1989 — 2000, and he is the owner of IR, Inc., which provides management services for many businesses in Put-in-Bay. McCann stated that the business objective of the Jet owners has always been to bring people to Put-in-Bay and support businesses there, in addition to earning a profit. McCann further stated that Todd Blumensaadt's "bonus incentive" as manager of Jet Express, is a 60/40 split of those profits.
 {¶ 48} McCann testified that the Jet Express leases the Port Clinton terminal from its sister company, First Island, which owns the terminal. The price of that lease is set by the Jet owners, based mainly on the cost of fuel. McCann further testified that he is not opposed to competition for ferryboat service to Put-in-Bay; however, he does not consider either the Rocket or Miller to be competition for the Jet Express. McCann stated he opposed Island Express's request to lease the municipal docks in Put-in-Bay because *Page 17 
of his concerns for privacy and noise from passengers drinking after 10 p.m. For those reasons, McCann would have opposed the use of public docks by any ferryboat line.
 {¶ 49} In support of its response, Island Express relied on the deposition testimony of Kevin Baxter, Duane Ohly, William Annand, Joseph Fratoe, Radd Riebe, Andrew Martin, and Bradley Norton.
 {¶ 50} In his deposition, Baxter testified that the Jet Express and the Rocket were primary competitors in the market for "late-night-high-speed" ferryboat service to Put-in-Bay. Baxter also testified that, in evaluating its competition, Island Express looked first to the Jet Express, then to other ferryboat services, including Miller. Baxter defined the Rocket's passenger base as "visitors to the Lake Erie Islands," particularly South Bass Island. He stated that, in addition to passengers, Miller ferryboats also carry vehicles and cargo to South Bass Island; however, Miller does not compete in the market for high-speed, late-night ferryboat service.
 {¶ 51} Baxter stated that, in spite of having a slower speed, Miller's ferryboats can carry more passengers than either the Jet Express or the Rocket and can reach South Bass Island in a shorter time because of the shorter distance traveled. He testified that any ferryboat company, including Miller, could offer late-night service to Put-in-Bay by making the required filing with the Public Utilities Commission of Ohio ("PUC0"). Baxter also stated that Miller's passengers disembark approximately two miles outside of Put-in-Bay, where they take golf carts, taxis, or bicycles, all of which are provided by a business operated by Jet owner Skip Duggan. *Page 18 
 {¶ 52} Baxter testified that Island Express and the Ladds signed a one-year lease in 1998; however, after that lease expired, the parties continued on an oral year-to-year basis until 2002. In 2002, the Ladds prepared a written lease and, in reliance on that lease, Island Express proceeded to make improvements to install a floating dock at Ladd's Marina and make improvements at the Jefferson Street pier in Port Clinton. However, Shawn Ladd never signed the lease. Baxter further testified that Todd Blumensaadt appeared interested in purchasing the Rocket at the May 28, 2003 meeting. Baxter stated that, at the meeting, Todd stated the Ladds owed him $28,000 for landscaping.
 {¶ 53} Baxter further testified that, after the Ottawa County Court of Common Pleas granted the injunction, Island Express representatives went to a Put-in-Bay city council meeting to ask for dock space in 2004. However, the request was opposed by Jet owners Duggan and Booker, as well as McCann, who was both mayor of Put-in-Bay and the president of the Jet Express. In addition, Baxter stated that Island Express representatives asked Booker for dock space; however, he referred them back to Todd Blumensaadt. Baxter stated he did not ask McCann about dock space at the Crew's Nest, because McCann opposed Island Express's request at the Put-in-Bay council meeting. He also stated that, in his opinion, the Rocket would have become profitable by 2006, if it had continued to operate.
 {¶ 54} Duane Ohly testified that passengers to Put-in-Bay are free to take any ferryboat they choose, including the ones operated by Miller. He further stated that Island Express kept no passenger list, since most of the Rocket's passengers were walk-up *Page 19 
up business. Ohly also testified that, during the meeting on May 28, 2003, Todd Blumensaadt asked him if the lease with the Ladds was "assignable," after which Baxter stated the lease was never signed, but "it didn't matter." Ohly stated that, after the Ladds' lease was terminated, he asked Miller for permission to rent dock space, but was turned down. Ohly further stated that, in his opinion, other inquiries would have been futile, because the Jet owners either owned or controlled all the available dock space at Put-in-Bay, with the exception of Miller's docks. Like Baxter, Ohly believed the Rocket would have become profitable by 2006.
 {¶ 55} William Annand, general manager of the Rocket from 2000-2003, testified that competition was "tough" in Port Clinton, since the Jet Express had an established market, good boats, and an aggressive advertising campaign. Annand further testified that he did not consider Miller to be "direct competition" for the Rocket, since it did not run from Port Clinton, and only took passengers to Put-in-Bay in the daytime.
 {¶ 56} Annand stated that, after the Ladds' lease was terminated, he spoke to Booker about dock space. Annand further stated that Booker directed him to Todd Blumensaadt; however, no meeting with Todd ever took place. Annand stated that the appropriateness of ferryboat dock space is based on many factors, including water depth, amount of traffic, congestion, and shore facilities, and a dock's suitability in an emergency situation is not the same as suitability on a regular basis. Annand testified that he did not approach Duggan, McCann or Miller about dock space in the winter of *Page 20 
2003; however, he was present at the Put-in-Bay council meetings where Island Express's request to rent city-owned dockage was denied.
 {¶ 57} Attorney Radd Riebe testified that he evaluated the Jet Express at the request of Jet owner George Stoiber. Riebe further testified that, in addition to the Rocket, the Jet Express's "major competition" included Miller. However, Riebe also stated that the Jet Express's boats were faster than Miller's and, therefore, were more focused on the "whole experience" of the trip to Put-in-Bay. Riebe stated that the Jet Express's assets include "high speed jet powered passenger-only catamaran ferries," and "risks" to the Jet Express include new competitors in the market, the local political climate, and underutilized assets. Riebe also stated that the Jet owners purchased another ferry service, the Island Hopper, in order to eliminate a competitor.
 {¶ 58} Bradley Norton, a business evaluator who helped Riebe value the Jet Express, testified under cross-examination that, at the time of the valuation, the Jet owners listed both the Rocket and Miller as competitors. Andrew Martin, personnel manager for Island Express, testified that the May 28, 2003 meeting between Baxter, Ohly, and Todd Blumensaadt, took place because Todd expressed an interest in buying the Rocket. Martin stated that he did not try to renew the lease after the Ladds' attorney sent Island Express a letter terminating the Ladds' lease, and there was no interference with the Rocket's use of Ladd's Marina while the injunction was in force.
 {¶ 59} On December 5, 2005, the trial court filed a judgment entry, in which it found that, as a matter of law, the Jet owners, PIB, and the Ladds were entitled to *Page 21 
summary judgment on several of Island Express's claims. Accordingly, the trial court granted partial summary judgment and dismissed Counts 1, 2, 3, 5, 8, and 10 of the complaint. Summary judgment was denied, and the trial court's proceedings were continued as to Counts 4, 6, 7, 9, and 11. The trial court further found that, pursuant to Civ.R. 54(B), there was "no just reason for delay."
 {¶ 60} On January 6, and January 13, 2006, the Jet owners, the Ladds, and PIB filed timely notices of appeal from the trial court's judgment. On January 11, 2006, Island Express filed a "Conditional Notice of Cross-Appeal." On January 23, 2006, Island Express filed a motion to dismiss the two notices of appeal, in which it argued that the trial court's denial of summary judgment did not constitute a final, appealable order.
 {¶ 61} On March 6, 2006, this court found that the trial court's December 5, 2005 judgment entry was not a final appealable order as to the denial of summary judgment on Counts 4, 6, 7, 9, and 11; however, the judgment was final and appealable as to the granting of summary judgment and dismissal of Counts 1, 2, 3, 5, 8, and 10. Accordingly, we dismissed the appeals filed by the Jet owners, PIB and the Ladds, and allowed Island Express's cross-appeal to proceed.
 {¶ 62} In its six assignments of error, Island Express collectively asserts the trial court erred by granting summary judgment to the Jet owners and dismissing Counts 2, 3, *Page 22 
5, and 8 of the complaint.[4] Accordingly, we will set out the standard of review for summary judgment, followed by an analysis of each separate issue raised on appeal.
 {¶ 63} We note at the outset that an appellate court reviews a trial court's granting of summary judgment de novo, applying the same standard used by the trial court. Lorain Natl. Bank v. Saratoga Apts. (1989),61 Ohio App.3d 127, 129; Grafton v. Ohio Edison Co. (1996),77 Ohio St.3d 102, 105. Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C).
 {¶ 64} Initially, the party seeking summary judgment bears the burden of informing the trial court of the basis for the motion and identifying portions of the record demonstrating an absence of genuine issues of material fact as to the essential elements of the non-moving party's claims. Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. If the moving party satisfies this initial burden, "the nonmoving party then has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." Id.
 {¶ 65} In its first assignment of error, Island Express asserts that the trial court erred by finding that the Jet Express and the Rocket competed in the same relevant market as Miller, and dismissing all of Island Express's antitrust claims on that basis. In *Page 23 
support, Island Express argues that the trial court incorrectly identified the "relevant product market" as all ferryboat service from the mainland to South Bass Island, in which Miller is the dominant provider of ferryboat services, as opposed to the smaller market of late-night-high-speed service to downtown Put-in-Bay, in which only Jet Express and the Rocket participated.
 {¶ 66} Island Express bases its antitrust claims on alleged violations of R.C. Chapter 1331 et seq, otherwise known as the "Valentine Act."
 {¶ 67} R.C. 1331.01(B) defines a "trust" as "a combination of capital, skill, or acts by two or more persons for any of the following purposes:
 {¶ 68} "(1) To create or carry out restrictions in trade or commerce;
 {¶ 69} "(2) To limit or reduce the production, or increase or reduce the price of merchandise or a commodity;
 {¶ 70} "(3) To prevent competition in manufacturing, making, transportation, sale, or purchase of merchandise, produce, or a commodity; * * *
 {¶ 71} "A trust as defined in division (B) of this section is unlawful and void."
 {¶ 72} Pursuant to R.C. 1331.06, "[a] contract or agreement in violation of sections 13331.01 to 1331.14, inclusive, of the Revised Code, is void."
 {¶ 73} The Valentine Act is patterned after the federal Sherman Antitrust Act, 15 U.S.C. § 1. C.K. J.K., Inc. v. Fairview ShoppingCtr. Corp. (1980), 63 Ohio St.2d 201 (The Ohio Supreme Court "has interpreted [R.C. 1331 et seq.] in light of federal judicial construction of the Sherman Act * * *." Id. At 204). In C.K. J.K.,Inc, the Ohio *Page 24 
Supreme Court cited Standard Oil Co. v. United States (1911),221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, in which the United States Supreme Court, construing the Sherman Act, stated that `"the criteria to be resorted to in any given case for the purpose of ascertaining whether violations * * * have been committed, is the rule of reason guided by the established law and by the plain duty to enforce the prohibitions of the act and thus the public policy which its restrictions were obviously enacted to subserve." Id., citing Standard Oil Co., supra.
 {¶ 74} Federal courts have stated that a rule of reason analysis requires the plaintiff to prove all of the following: "(1) that the defendant(s) contracted, combined, or conspired; (2) that such contract produced adverse anticompetitive effects; (3) within the relevant product and geographic markets; (4) that the objects of and conduct resulting from the contract were illegal; and (5) that the contract was a proximate cause of plaintiffs [antitrust] injury." Care Heating Cooling, Inc. v. American Standard, Inc. (C.A. 6, 2005), 427 F.3d. 1008, 1014, citing Int'l Logistics Group, Ltd. v. Chrysler Corp.,884 F.2d 904, 907 (6th Cir.1989).
 {¶ 75} The second and third prongs of the Care test are the subject of Island Express's first assignment of error.[5] Accordingly, in order to survive summary judgment, Island Express must show that a genuine issue of material fact exists as to whether the *Page 25 
actions of the Jet owners, in concert with PIB and the Ladds, adversely affected competition within the "relevant product market."
 {¶ 76} Island Express first argues that Miller does not operate in the same relevant product market as the Jet Express. Therefore, by eliminating the Rocket as competition, the Jet owners were able to secure a monopoly in the market for lat-night-high-speed service to Put-in-Bay. In support, Island Express states that a portion of the services offered by the Jet Express [and, at one time, the Rocket], differed from the service offered by Miller in ways that definitively distinguish the two markets. Specifically, Island Express claims that: 1) Miller does not take passengers to Put-in-Bay after dark; 2) Miller charges approximately one-half as much per fare as the Jet Express; 3) Miller carries passengers to a location several minutes outside of downtown Put-in-Bay; and 4) the Jet Express advertises its service as "the fastest way to Put-in-Bay," as opposed to other methods of transportation. However, Island Express's premise that the relevant product market is limited only to late-night-high-speed ferryboat service to Put-in-Bay is fatally flawed for the following reasons.
 {¶ 77} The term "relevant product market" has been judicially defined as "the `"area of effective competition in which the seller * * * operates, and to which the purchaser * * * can practicably turn for supplies * * *."'" Reading Int'l, Inc. v. Oaktree Capital Mgmt.LLC, 2007 WL 39301 (S.D.N.Y. 2007), quoting United States v. EastmanKodak, 63 F.3d 95, 104 (2d Cir.1995) (quoting Tampa Elec. Co. v.Nashville Coal Co., 365 U.S. 320, 327 (1961)). In determining the relevant market in an antitrust context, *Page 26 
"`no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that "part of the trade or commerce", monopolization of which may be illegal.'"Worldwide Basketball and Sport Tours, Inc. v. National CollegiateAthletic Assn., 388 F.3d 955, 961 (6th Cir., 2005), quoting UnitedStates v. E.I. du Pont de Nemours Co., 351 U.S. 377, 395,76 S.Ct. 994, 100 L.Ed. 1264 (1956).
 {¶ 78} "Reasonable interchangeability `may be gauged by (1) the product uses, i.e., whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity); that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service.'" Id., quoting White White, Inc. v. Amer. Hosp. Supply Corp.,723 F.2d 495, 499 (6th Cir.1983) (citation omitted).
 {¶ 79} As set forth above, the Jet owners and Island Express each presented testimony that Miller, the Rocket and the Jet Express competed for passengers to Put-in-Bay on a daily basis. In addition, it is undisputed that Miller was fully capable of offering late-night service to Put-in-Bay but, for some unknown reason, chose not to do so. It is also undisputed that, although Miller's boats are slower than the Jet Express, they take more passengers to Put-in-Bay in less time than either the Jet Express or the Rocket, and at approximately half the cost.
 {¶ 80} A review of the record reveals no evidence that passengers regularly chose the Jet Express and/or the Rocket over Miller for any reason other than the location from which they desired to travel to Put-in-Bay. In addition, no evidence was presented as to *Page 27 
how much of the Jet Express's and the Rocket's business was directly attributable to late-night-high-speed service to Put-in-Bay. Without such evidence, it is impossible to determine whether a separate, viable market for that service existed. It is also impossible to determine whether the Jet Express would be able to raise its prices after the Rocket went out of business, or whether customers would respond to a price increase by electing to take Miller's ferryboat to Put-in-Bay.
 {¶ 81} Island Express attempts to bolster its argument by arguing that the Jet Express was advertised as "the fastest way to Put-in-Bay." However, the use of such a statement is merely a marketing tool employed by the Jet Express to compete for passengers to Put-in-Bay. It does not constitute evidence sufficient to raise a genuine issue of material fact as to the scope of such a market. See MacNealy v. Dayton OsteopathicHosp. Inc. (S.D. Ohio, W.D. 1993), 1993 WL 1377513 (An advertising campaign by a hospital that distinguishes one service from another on the basis of which doctor performs the service is a "marketing tool" that only serves to demonstrate an attempt to compete with other institutions.").
 {¶ 82} On consideration of the foregoing, we find that Island Express has not presented sufficient evidence to demonstrate that the "relevant product market" is anything other than ferryboat service from the mainland to South Bass Island. Accordingly, Island Express has not satisfied the third prong of the Care test by showing that the Jet owners were capable of adversely affecting competition within the relevant product market. *Page 28 
 {¶ 83} Next, Island Express claims it suffered an antitrust injury when the Jet owners caused the Ladds to cancel Island Express's lease, forcing the Rocket to go out of business at the end of the 2003 boating season. This argument is also misplaced.
 {¶ 84} It is well-established that the purpose of the Sherman Act and, by extension, the Valentine Act, is "to protect competition and the market as a whole, not individual competitors." Care Heating and CoolingInc. v. American Standard, Inc., supra, at 1014, citing Nat'l HockeyLeague Players' Ass'n v. Plymouth Whalers Hockey Club, 325 F.3d 712, 720
(6th Cir.2003) (other citation omitted). Accordingly, an "[individual injury, without accompanying market-wide injury, does not fall within the protections of the Sherman Act." Id. An antitrust claim will not succeed if it is "based upon nothing more than injuries allegedly suffered by a [single] competitor, rather than on harm to competition in the relevant market." Baseball at Trotwood, LLC v. Dayton Prof. BaseballClub, LLC (S.D.Ohio W.D. 1999), 113 F.Supp.2d 1164, 1172
 {¶ 85} It is undisputed that, even before the Ladds cancelled Island Express's lease, the Rocket was losing money.[6] In addition, the record shows that the Jet Express's biggest competitor was Miller, not the Rocket. Accordingly, Island Express has not satisfied the second prong of the Care test, because the evidence presented shows only that the Ladds' cancellation of the lease eliminated a single, weaker competitor from the market for ferryboat service from the mainland to South Bass Island. *Page 29 
 {¶ 86} On consideration of the entire record that was before the trial court and the law, this court finds, after construing the evidence most strongly in favor of the non-moving party, that Island Express has not demonstrated the existence of a genuine issue of material fact as to whether the Jet owners' actions resulted in harm to competition, in the antitrust sense, within the relevant market.[7] Island Express's first assignment of error is not well-taken.
 {¶ 87} In its second assignment of error, Island Express asserts that the trial court erred by dismissing its claims for antitrust conspiracy. However, in order to demonstrate an antitrust conspiracy, a plaintiff must show "that the defendants contracted, combined, or conspired among each other that the combination or conspiracy produced adverse, anticompetitive effects within the relevant product and geographic markets, that the objects of the and conduct pursuant to that contract or conspiracy were illegal and that the plaintiff was injured as a proximate result of that conspiracy." Crane Shovel Sales Corp. v.Bucyrus-Erie Co., 854 F.2d 802, 805 (6th Cir.1988).
 {¶ 88} In its December 8, 2005 judgment entry, the trial court found a genuine issue of material fact existed as to whether the Jet owners, PIB, and the Ladds were capable of conspiring together to produce an antitrust injury. Nevertheless, on consideration of our determination as to Island Express's first assignment of error, we find Island Express has not demonstrated that an issue of facts remains as to whether an antitrust conspiracy occurred which adversely affected competition within the relevant *Page 30 
market of ferryboat service from the mainland to South Bass Island. Island Express' second assignment of error is, therefore, not well-taken.
 {¶ 89} In its third assignment of error, Island Express asserts that the trial court erred by dismissing its claims for monopolization and/or attempted monopolization. However, it is well-settled that, in order to demonstrate illegal monopolization or attempted monopolization, a plaintiff must show, "in addition to the possession of monopoly power in the relevant market, `the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" VerizonCommunications, Inc. v. Law Offices of Curtis V. Trinko, LLP,540 U.S. 398, 408, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004), quoting United Statesv. Grinnell Corp., 384 U.S. 563, 570-571, 86 S.Ct. 1698, 16 L.Ed.2d 778
(1966).
 {¶ 90} On consideration of the foregoing and our determination as to Island Express's first assignment of error, we find that Island Express has not demonstrated that an issue of fact remains as to whether the Jet owners were capable of illegally acquiring monopoly power within the relevant market of ferryboat service from the mainland to South Bass Island. Accordingly, the trial court did not err by dismissing Island Express's claim of illegal monopolization and/or attempted monopolization on the part of the Jet owners, PIB, and the Ladds, and Island Express's third assignment of error is not well-taken. *Page 31 
 {¶ 91} In its fourth assignment of error, Island Express first argues that the trial court erred when it found Island Express is "collaterally estopped" from claiming that either: 1) Island Express had a written lease with Ladd's Marina; or 2) the oral lease between Island Express and Ladd's Marina extended beyond the 2003 boating season. In support, Island Express does not claim the Ottawa County court's decision to grant an injunction for the remainder of the 2003 boating season was in error. Rather, Island Express claims the injunction was a preliminary, not a final, order. Second, Island Express claims the Ottawa County trial court's order was "dissolved" when the complaint was dismissed in that action. In analyzing this assignment of error, we will address each of Island Express's arguments individually.
 {¶ 92} As to Island Express's first argument, normally, a preliminary injunction is issued "to preserve a status between the parties pending a trial on the merits." Procter Gamble Co. v. Stoneham (2000),140 Ohio App.3d 260, 267. The party requesting a preliminary injunction is required to show that "(1) there is a substantial likelihood that the plaintiff will prevail on the merits, (2) the plaintiff will suffer irreparable injury if the injunction is not granted, (3) no third parties will be unjustifiable harmed if the injunction is granted, and (4) the public interest will be served by the injunction." Id.
 {¶ 93} In contrast, a permanent injunction "is issued after a hearing on the merits in which a party has demonstrated a right to relief under the applicable substantive law." Id. The party seeking a permanent injunction must show that it is necessary "to prevent irreparable harm and that the party does not have an adequate remedy at law." Id. The *Page 32 
required elements for either type of injunction must be established by clear and convincing evidence. Id. at 268.
 {¶ 94} The record shows that the Ottawa County trial court found that the Ladds never signed the 2002 lease; however, the parties had, for some time, operated under an oral agreement as to its terms. The trial court also found that Island Express would suffer irreparable harm, in the form of "catastrophic implosion or bankruptcy," if injunctive relief were not granted, and Island Express was entitled to injunctive relief because the Ladds gave no notice of a breach, or opportunity to cure such breach, "as required by Ohio law." Finally, the Ottawa County trial court found the public would not be harmed by allowing Island Express to continue to lease Ladd's Marina for a limited period of time.
 {¶ 95} In its decision, the Ottawa County trial court consolidated Island Express's injunction requests pursuant to Civ.R. 65(B)(2), which provides that "[b]efore or after the commencement of the hearing of application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application. * * *." Based on the above findings, the Ottawa County trial court concluded that Island Express demonstrated by clear and convincing evidence that it was entitled to a permanent injunction prohibiting interference with the Ladds' lease until after October 31, 2003. Thereafter, Island Express leased dock space at Ladd's Marina in accordance with the terms of the injunction until October 31, 2003. It was not until December 2003, after the injunction expired, that Island Express dismissed the *Page 33 
complaint pending in the Ottawa County case, and commenced this action in Erie County.
 {¶ 96} On consideration of the entire record, including those portions of the Ottawa County record that are before this court, we find that the injunction was issued by the Ottawa County trial court on the merits of Island Express's claim against the Ladds. See Dome Energicorp v.Middleburg Heights (Feb. 6, 1988), 8th Dist. No. 50026; Refreshment Svc.Co., Inc. v. Cleveland (1980), 63 Ohio St.2d 89, 93 (By holding a hearing on a request for an injunction, a trial court is, in effect, addressing the merits of the case.) Because the Ottawa County complaint was ultimately dismissed, the issue of whether Island Express had a "substantial likelihood of success" at trial on its claims has become moot. Proctor Gamble Co., supra, (A determination on the merits, made after a consolidation pursuant to Civ.R. 65(B), "effectively renders moot the consideration of a likelihood of success on the merits' * * *" Id at 269). Accordingly, we find that the trial court correctly determined that the Ottawa County trial court's order was a permanent injunction. Island Express's first argument is without merit.
 {¶ 97} Island Express's second argument is also without merit, for the following reasons. As set forth above, Island Express waited until after the permanent injunction expired before dismissing the complaint in that forum and bringing this action in Erie County. Later, Island Express's motion to consolidate this case with the one originally filed in Ottawa County was denied. That decision has not been challenged on appeal. *Page 34 
 {¶ 98} On consideration of the foregoing, we agree with the trial court that Island Express is collaterally estopped from re-litigating in another forum the underlying issue of whether it had a binding written agreement to lease dock space at Ladd's Marina after October 31, 2003.State, ex rel. Pyle v. Bessey, 112 Ohio St.3d 119, 2006-Ohio-6514, ¶ 11
('"[Collateral estoppel prevents parties from relitigating in a subsequent case facts and issues that were fully litigated in a previous case.'" Id., quoting State ex re. Stacy v. Batavia Loc. School Dist. Bd.Of Edn., 97 Ohio St.3d 269, 2002-Ohio-6322, ¶ 16). See, also, Young v.Gorski, 6th Dist. No. L-03-1243, 2004-Ohio-1325 ("Justice does not permit a second bite at the apple" where a party who has failed to zealously represent his or her own interests in one case seeks to reassert the same rights in another forum. Id at ¶ 11-14. Island Express's fourth assignment of error is not well-taken.
 {¶ 99} In its fifth assignment of error, Island Express asserts that the trial court erred by finding that Island Express failed to state a claim for tortious interference with a business relationship. Specifically, Island Express argues that Todd Blumensaadt tortiously interfered with its relationship with Ladd's Marina by convincing the Ladds to terminate the 2002 lease.
 {¶ 100} As stated in our determination of Island Express's fourth assignment of error, Island Express is collaterally estopped from asserting that it had anything other than an oral, year-to-year lease for dock space at Ladd's marina. Accordingly, Island Express may not argue on appeal that Todd Blumensaadt's actions interfered with the relationship between Island Express and the Ladds, based on the written 2002 lease. *Page 35 
However, as set forth above, the trial court found that: 1) a genuine issue of fact remains as to whether Island Express and the Ladds had a business relationship based on promissory estoppel; and 2) if such a relationship exists, it could provide a basis for Island Express's claims of breach of contract, tortious interference with a business relationship, and civil conspiracy.
 {¶ 101} On consideration of the foregoing, we find that the trial court has yet to determine whether a relationship between Island Express and Ladd's Marina existed based on promissory estoppel. After that determination is made, the trial court will then be in the best position to determine whether such a relationship provides the basis for a tortious interference claim against Todd Blumensaadt. Island Express's fifth assignment of error is, therefore, premature and not well-taken.
 {¶ 102} In its sixth assignment of error, Island Express asserts that the trial court erred by dismissing its claim of tortious interference against the Ladds.[8] In support, Island Express argues that its "prospective relationship" with future ferryboat customers was well-established, the Ladds knew of such a relationship, the Ladds intentionally breached the 2002 lease with the goal of putting the Rocket out of business, and Island Express was unable to serve its customer base after the 2003 season because the lease agreement was breached.
 {¶ 103} Pursuant to our determination as to Island Express's fourth assignment of error, Island Express is estopped from asserting a claim that the Ladds *Page 36 
tortiously interfered with its customer base by terminating the written 2002 lease. As set forth above, the trial court has yet to determine whether Island Express can establish through promissory estoppel that it had the right to use the dock at Ladd's Marina after October 2003. Without such a finding, Island Express cannot prevail on a claim against the Ladds for tortious interference with its prospective customer base. For these reasons, Island Express's sixth assignment of error is premature and, therefore, is not well-taken.
 {¶ 104} On consideration whereof, we further find that there remains no other genuine issue of material fact and, after considering the evidence presented most strongly in favor of Island Express, the Jet owners, PIB, and the Ladds are entitled to summary judgment as a matter of law.
 {¶ 105} The judgment of the Erie County Court of Common Pleas is hereby affirmed. Island Express is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Erie County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Peter M. Handwork, J., Arlene Singer, J., and *Page 37 George M. Glasser, J., Concur.
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.
[1] As set forth above, appellants will be collectively referred to herein as "Island Express." However, where appropriate, the ferryboat line operated by island Express, and the individual boats known as Rocket I, II, and III, will be referred to as "the Rocket."
[2] It is undisputed that the only year in which Island Express showed a profit was 1998.
[3] The complaint was amended on May 10, 2005, when the Ladds were added as defendants. To avoid confusion, the counts set forth above are as listed in the amended complaint.
[4] Appellants do not argue on appeal that the trial court erred by dismissing Counts 1 and 10 of the complaint.
[5] As to the first prong of the Care test, the trial court found a genuine issue of material fact exists "as to whether or not two or more persons combined to act as a trust or in conspiracy with each other as set forth in [Island Express'] anti-trust and conspiracy claims." That conclusion has not been challenged on appeal.
[6] Island Express presented only Baxter's and Ohly's unsupported testimony that the boat line could have become profitable by 2006, if it had stayed in business.
[7] Because Island Express has failed to meet the second and third prongs of the Care test, we need not address the fourth and fifth prongs.
[8] Island Express acknowledges that it is no longer pursuing a claim of tortious interference against the Jet owners. *Page 1