[Cite as *Avery Dennison Corp. v. TransAct Technologies, Inc.*, 2013-Ohio-4551.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| AVERY DENNISON CORPORATION, | : | **O P I N I O N** |
| Plaintiff-Appellant, | : | |
| - vs - | : | **CASE NO. 2012-L-132** |
| TRANSACT TECHNOLOGIES, INC., et al., | : | |
| Defendants-Appellees. | : | |

Civil Appeal from the Lake County Court of Common Pleas, Case No. 12 CV 001586.

Judgment: Affirmed and remanded.

*Andrew G. Fiorella, Yelena Boxer* and *James L. Weinberg*, Ulmer & Berne LLP, 1660 West 2nd Street, Suite 1100, Cleveland, OH 44113 (For Plaintiff-Appellant).

*Dalila Argaez Wendlandt* and *Arwyn Carroll,* Ropes & Gray, LLP, Prudential Tower, 800 Boylston Street, Boston, MA 02199; *Janice V. Jabido,* Ropes & Gray, LLP, 111 South Wacker Drive, 46th Floor, Chicago, Il, 60606; *Steven Auvil, Matthew D. Gurbach* and *Lori H. Welker,* Benesch, Friedlander, Coplan & Aronoff LLP, 200 Public Square, Suite 2300, Cleveland, OH 44114 and *James L. McCrystal, Jr.*, Brzytwa, Quick & McCrystal, L.L.C., 1660 W. 2nd Street, Suite 900, Cleveland, OH 44113 (For Defendant-Appellee Transact Technologies, Inc.).

*Jason Herro*, pro se, 4690 Bradon Trail East, Brookfield, WI 53045 (Appellee).

COLLEEN MARY O'TOOLE, J.

{¶1} Avery Dennison Corporation appeals from the November 8, 2012 judgment entry of the Lake County Court of Common Pleas, denying its application for a

preliminary injunction against TransAct Technologies, Inc., in a trade secrets case. We affirm.

{¶2}   We note at the onset that this case is subject to a protective order issued by the trial court: the record, and the briefs of the parties, are under seal.

{¶3}   Avery Dennison is a dominant force in the production of food safety terminals, which help food service businesses control inventory and prevent food spoilage.  At the time Avery Dennison filed its complaint in 2012, its current model was the 9415 FreshMarx Automated Labeling System.  The unit contains a touch screen, and two printers.  Food service employees are able to print out information such as the type of food, nutritional information, when a food item was prepared, and when the item must be discarded.  The machine can produce a variety of labels to affix to food or food containers.  The 9415 has been in production for almost ten years.  The majority of them have been sold to a single, major customer.[1]

{¶4}   Jason Herro was an employee of Avery Dennison, or a predecessor company, from 1999 until 2011.  He worked in sales and marketing.  In 2009, he was made national sales director for the 9415 FreshMarx.  He was thoroughly familiar with the machine, and had close dealings with customer A, the principal purchaser of the machine.  As early as 2009, Mr. Herro's contact at customer A had informed him that customer A desired an updated machine.  The principal updates sought were a larger touch screen, to make the machine easier to operate; a smaller "footprint" – i.e., reduced size; and, a reduced price.  Evidence indicates that Avery Dennison was slow to respond to these requests from customer A.  It appears there was some consideration at Avery Dennison of not continuing in the food safety terminal business,

[1]. The trial court referred in its judgment entry to this customer as "customer A."  We do likewise.

but rather, selling the 9415 FreshMarx line to a competitor. Eventually, however, plans were made to build an updated food safety terminal, presently designated the 9417. Nevertheless, there are indications in the record that Mr. Herro may have felt his position at Avery Dennison was imperiled.

{¶5} At trade shows, Mr. Herro came to know representatives of TransAct, a Connecticut based manufacturer of printers. TransAct does a large business in the food service, banking, gambling, medical, and energy industries. A major product line is "point of sale" printers, such as those printing receipts in grocery checkout lines and at restaurants. TransAct has sold many such printers to customer A. At a certain point, Mr. Herro proposed that Avery Dennison take over the sale of certain TransAct printers which did not compete directly with items already produced by Avery Dennison. This was attractive to each company, as TransAct is, essentially, a manufacturer with a small sales staff, whereas Avery Dennison has a large national sales staff. However, talks between the companies terminated in September 2010 without result.

{¶6} Bart Shuldman is the chief executive officer of TransAct. He testified that, following changes in the banking industry consequent to the September 11, 2001 attacks on this country, TransAct had been able to make a large profit, by following closely new proposed regulations. He testified that in 2010, he became aware of new proposed regulations regarding food safety, and began researching the issue. By February 2011, TransAct had purchased an Avery Dennison 9415 FreshMarx, and begun the process of reverse engineering it. Further, TransAct had studied the other principal food safety terminals.

**{¶7}** In September 2010, when talks between Avery Dennison and TransAct regarding sale of the TransAct printers broke down, Mr. Herro commenced discussions with Tracey Chernay, executive vice president for sales and marketing at TransAct, about taking a position with her company. September 24, 2010, Mr. Herro allegedly emailed to his private account Avery Dennison documents regarding its proposed successor to the 9415 FreshMarx.[2] These were the Business Plan, and the Market Requirements Document. The first contains, in particular, market size information, costs, profit margins, and other financial data. The latter details certain engineering and technical information regarding the proposed successor machine.

**{¶8}** Mr. Herro met with Mr. Shuldman regarding a job with TransAct on October 5, 2010. Thereafter, Mr. Herro and Ms. Chernay emailed each other regarding terms of employment. February 1, 2011, Mr. Herro emailed a power point presentation to TransAct regarding opportunities in the food safety industry, as by expanding it to hotels, prisons, casinos, colleges, and other establishments which had not been served previously. The presentation discussed what features a new food safety terminal should possess, and how such a machine should be priced to beat competition. Avery Dennison maintains that this presentation explicitly relied on and revealed confidential information regarding its plans for the successor to the 9415 FreshMarx.

**{¶9}** In late March 2011, TransAct offered Mr. Herro a position as vice president in charge of food service technology. He was to lead development of products and sales in this field, and work with the engineering department regarding development of new products. Mr. Herro covenanted to TransAct that he had not taken

---

2. The trial court found no evidence that Mr. Herro emailed the Market Requirements Document to his private email account.

any trade secrets or other confidential information from Avery Dennison, and that he was not under a non-competition agreement with that company. He commenced on his new duties April 29, 2011. He informed friends at Avery Dennison that his job at TransAct was involved in servicing its gambling industry clients.

{¶10} Meetings were held between TransAct and customer A in late May 2011, to determine the latter's desires regarding a new food safety terminal. In January 2012, Mr. Herro was terminated by TransAct, allegedly for failing to pursue new customers for the food safety terminal, apart from customer A. Eventually, Avery Dennison became aware of the new TransAct machine, the Ithaca 9700.[3]

{¶11} June 8, 2012, Avery Dennison filed a complaint against TransAct and Mr. Herro, seeking preliminary and permanent injunctions, and damages. The complaint included eight causes of action: (1) misappropriation of trade secrets by both defendants; (2) inevitable disclosure of trade secrets against both defendants; (3) breach of confidentiality agreement against Mr. Herro; (4) breach of confidentiality agreement against TransAct; (5) breach of duty against Mr. Herro; (6) inducement to breach of contract against TransAct; (7) tortious interference with business relationships against both defendants; and (8) unfair competition against both defendants. July 16, 2012, TransAct answered and counterclaimed.

{¶12} A four day hearing commenced in the trial court in early August 2012. In addition to live testimony, numerous depositions were submitted to the trial court, and scores of exhibits. November 8, 2012, the trial court filed a thorough and thoughtful judgment entry, denying the application for a preliminary injunction against TransAct,

---

3. TransAct's engineering operations appear to be centered in Ithaca, New York.

but granting one, in part, against Mr. Herro, regarding the Avery Dennison Business Plan he emailed to his personal email account September 24, 2010. This appeal ensued November 16, 2012.

{¶13} A trial court's decision to grant or deny a preliminary injunction is reviewed for abuse of discretion. *e² solutions v. Hoelzer*, 6th Dist. Lucas No. L-08-1295, 2009-Ohio-772, ¶12.

{¶14} "The term 'abuse of discretion' is one of art, connoting judgment exercised by a court which neither comports with reason, nor the record. *State v. Ferranto*, 112 Ohio St. 667, 676-678, * * * (1925). An abuse of discretion may be found when the trial court 'applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact.' *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, ¶15, * * * (8th Dist.2008)." (Parallel citations omitted.) *State v. Sands*, 11th Dist. Lake No. 2012-L-096, 2013-Ohio-2822, ¶11.

{¶15} In a complaint requesting a preliminary injunction, "a plaintiff must establish "'(1) there is a substantial likelihood that the plaintiff will prevail on the merits, (2) the plaintiff will suffer irreparable injury if the injunction is not granted, (3) no third parties will be unjustifiably harmed if the injunction is granted, and (4) the public interest will be served by the injunction." *Island Express Boat Lines Ltd v. Put-In-Bay Boat Line Co.*, 6th Dist. No. E-06-002, 2007-Ohio-1041, ¶92, quoting *Procter & Gamble Co. v. Stoneham* (2000), 140 Ohio App.3d 260, 267, * * *; see, also, Civ.R. 65(B) and R.C. 2727.02.' *Neal v. Manor* [6th Dist. No. L-07-1055, 2008-Ohio-257] * * *, ¶11." *e² solutions* at ¶15.

6

**{¶16}** Further, "[t]he party seeking the preliminary injunction must establish a right to the preliminary injunction by showing clear and convincing evidence of each element of the claim." *Sinoff v. Ohio Permanente Med. Group*, *Inc.,* 146 Ohio App.3d 732, 740 (8th Dist.2001).

**{¶17}** "'Clear and convincing evidence' is '(* * *) the amount of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations to be proved. It is an intermediate standard (* * *) being more than a preponderance of the evidence and less than evidence beyond a reasonable doubt.' *State v. Ingram* (1992), 82 Ohio App.3d 341, 346, * * *." (Parallel citation omitted.) *Butler v. Butler*, 11th Dist. Portage No. 2009-P-0002, 2009-Ohio-5065, ¶23.

**{¶18}** Avery Dennison assigns two errors on appeal. The first is: "The Trial Court's Order * * * denying a preliminary injunction to Appellant-Plaintiff Avery Dennison Corporation is against the manifest weight of the evidence and controlling law where the record demonstrates a likelihood of success on the merits." Under this assignment of error, Avery Dennison presents the following issue(s) for review:

**{¶19}** "Did the Trial Court err by denying a preliminary injunction to Avery Dennison where the record demonstrates that: (a) Jason Herro (who is Avery Dennison's former national director of sales for its food safety business) stole highly confidential Avery Dennison's Business Plan and Market Requirement Document, which are the blueprints for an unreleased, next-generation food safety printer ('9415NG'); (b) the CEO of TransAct contacted Herro within a few hours of the theft; (c) TransAct and Herro met multiple times to discuss TransAct's entry into the food safety business, while Herro was still an Avery Dennison employee; (d) TransAct secretly hired Herro to lead

7

the development and marketing of a new food safety printer (dubbed 'Project Shadow') to compete with Avery Dennison; (e) TransAct developed the Project Shadow printer, which incorporates key features and designs of Avery Dennison's 9415NG, in record time and with virtually no budget; and (f) TransAct has no evidence of development before Herro's arrival?"

{¶20} Initially, we note that the Supreme Court of Ohio has clarified the analysis used to determine whether judgments in civil cases are against the manifest weight of the evidence. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶12-23. In *Eastley*, the Supreme Court noted that most of Ohio's appellate courts applied the analysis set forth in *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279. *Eastley* at ¶14. In *C.E. Morris*, the court held: "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris* at the syllabus. As the court in *Eastley* observed, this is the standard applicable to determining the sufficiency of the evidence underpinning a judgment. *Id.* at ¶14. The court held that the proper analysis for determining challenges to the manifest weight of the evidence is the same in civil and criminal cases, and that *State v. Thompkins*, 78 Ohio St.3d 380 (1997) applies to both. *Id.* at ¶17-20. The court quoted with approval the following language used by the Ninth Appellate District:

{¶21} ""The (reviewing) court (* * *) weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the (finder of fact) clearly lost its way and created such a manifest miscarriage of justice that the (judgment) must be reversed and a new trial

ordered.'" (Alterations made in *Tewarson) Tewarson v. Simon*, 141 Ohio App.3d 103, 115, * * * (9th Dist.2001), quoting *Thompkins*, 78 Ohio St.3d at 387, * * *, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, * * * (1st Dist.1983)." (Parallel citations omitted.) *Eastley* at ¶20.

{¶22} The court in *Eastley* further observed that in weighing the evidence in civil cases, courts of appeals must make every presumption in favor of the finder of fact, and construe the evidence, if possible, to sustain the judgment of the trial court. *Id.* at ¶21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶23} In the judgment entry in this case, the trial court found that substantial evidence was presented by TransAct that it developed the Ithaca 9700 through information generally available to the public, and reverse engineering of a 9415 FreshMarx machine it purchased. Avery Dennison seeks to counter this through two arguments. First, it notes the lengthy and secretive negotiations between Mr. Herro and TransAct regarding employment, at a time he was still a high ranking employee of Avery Dennison. Further, it contends that the Ithaca 9700 – especially regarding the requirements for that machine as outlined in the February 1, 2011 power point presentation sent by Mr. Herro to TransAct – were essentially derived from the Avery Dennison Business Plan and Market Requirement Document regarding its own new machine.

{¶24} The lengthy negotiations between Mr. Herro and TransAct may appear suspicious. However, the essential point is whether TransAct used Avery Dennison trade secrets in devising the Ithaca 9700. We must agree with the trial court that Avery Dennison failed to show this by the high standard of clear and convincing evidence.

9

{¶25} The Ohio version of the Uniform Trade Secrets Act defines a trade secret at R.C. 1333.61:

{¶26} "(D) 'Trade secret' means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

{¶27} "(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

{¶28} "(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

{¶29} However, a competitor is not liable for misappropriation of a trade secret if it discovers the information by independent means or by reverse engineering. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 182 (1999). Further, disclosure of alleged confidential information to a customer or potential customer, absent a confidentiality agreement, may limit any action under the trade secrets laws. *Thermodyn Corp. v. 3M Co.*, 593 F.Supp. 2d 972, 986 (N.D.Ohio 2008).

{¶30} TransAct introduced evidence that many of the features incorporated in the Ithaca 9700 were derived from a 9415 FreshMarx machine it purchased and reverse engineered. This is not improper. Avery Dennison points to the fact that the Ithaca 9700 has its two printers directly below the touch screen, just as in the proposed new generation Avery Dennison device. TransAct introduced testimony that this is the only

10

place to put the printers, without interfering with the operation of the touch screen. Avery Dennison points out that the Ithaca 9700 is the same size as its proposed new generation machine, and has a larger touch screen than previous food safety terminals. However, Mr. Herro's contact at customer A deposed that he had been urging a new, smaller food safety terminal, with larger touch screen, for several years, and that customer A did not consider its communications to Avery Dennison on these points as confidential. Avery Dennison points out that many of the potential customers listed in Mr. Herro's February 1, 2011 power point presentation to TransAct are customers it worked with or wished to develop. TransAct points out that the lists of potential customers in the Avery Dennison Business Plan Mr. Herro improperly took, and his February 1, 2011 power point presentation do not fully coincide, and that each customer listed is a well known fast food franchisor, or other obvious participant in the market for food safety terminals. Avery Dennison objects that the proposed pricing of the Ithaca 9700 was derived from its Business Plan. TransAct introduced evidence that the proposed pricing of the Ithaca 9700, suggested by Mr. Herro, was determined by the desire to produce a machine cheaper than any known rival, while maintaining TransAct's publicly announced profit margin on new products.

{¶31} Thus, there was evidence before the trial court that TransAct developed its new machine independently, and by reverse engineering. It so held. Avery Dennison simply failed to carry its burden of proof that TransAct used Avery Dennison trade secrets in that machine's development, and thus, that it was likely to prevail ultimately on the merits. Further, the evidence before the trial court was of an amount and quality not susceptible to a manifest weight challenge under the clear and convincing standard.

11

{¶32} The first assignment of error lacks merit.

{¶33} Avery Dennison's second assignment of error is: "The Trial Court's Order denying a preliminary injunction * * * is against the manifest weight of the evidence and controlling law where the record demonstrates clear and convincing evidence of the threat of irreparable harm to Avery Dennison."

{¶34} Under this assignment of error, Avery Dennison presents the following issue for review:

{¶35} "Did the Trial Court err by denying a preliminary injunction to Avery Dennison where the record demonstrates that: (a) release of TransAct's Project Shadow printer will likely destroy Avery Dennison's food safety business; (b) harm to Avery Dennison's reputation and good will as a technology leader; and (c) TransAct contractually acknowledged that money damages would not be a sufficient remedy for a disclosure or use of Avery Dennison's information?"

{¶36} This assignment goes to the second prerequisite for granting a preliminary injunction: that the complainant makes a showing of irreparable harm absent the grant. *e² solutions*, *supra*, at ¶15. However, a party seeking a preliminary injunction must prove all four prerequisites by clear and convincing evidence. *Sinoff*, *supra*, at 740. As we have already determined that Avery Dennison failed to carry its burden regarding whether it would succeed on the merits, we deem this issue moot. App.R. 12(A)(1)(c).

{¶37} The judgment of the Lake County Court of Common Pleas is affirmed. All pending motions are hereby overruled. The court finds there were reasonable grounds for this appeal.

CYNTHIA WESTCOTT RICE, J., concurs,

TIMOTHY P. CANNON, P.J., dissents with a Dissenting Opinion.

_____

TIMOTHY P. CANNON, P.J., dissenting.

{¶38} I respectfully dissent from the opinion of the majority. As acknowledged by both parties, the trial court made an error in the recitation of its findings with regard to what Herro stole. At page 10 of its entry, the trial court found the evidence was clear that on September 24, 2010, Herro improperly transferred confidential and proprietary Avery Dennison information to his home computer. However, the court opined that the information contained in this document "did not explicitly describe the dimensions, appearance or other details needed to start the engineering of this product."

{¶39} The trial court then noted that another document, the "Second Generation Freshness Dating System (Preliminary)," *did provide* detailed specifications, *but that there was no evidence that Herro took or made copies of this document*. The trial court concluded there was "no evidence that Herro e-mailed this drawing to his home computer or directly disclosed it to anyone else. Thus the only clear violation of the Patent and Confidential Information Agreement which would warrant injunctive relief was Herro's e-mailing of the business plan to his home computer on September 24, 2010."

{¶40} Therefore, the trial court properly recognized the significant value of the Second Generation document; yet, it did not make a finding that Herro had also e-mailed this to his home computer. In their appellate briefs, both parties acknowledge

13

that the evidence at trial established Herro's theft of a document referred to as Avery Dennison's Market Requirement Document ("MRD"). By reference to the information contained therein, it appears this is the same document the trial court refers to as the Second Generation document.

{¶41} TransAct contends in its brief that the trial court's erroneous finding "that 'there is no evidence that Herro took or made copies' of Avery's MRD does not warrant reversal * * * because Avery presented no evidence that Herro conveyed the MRD or any information contained therein to TransAct." That is simply not true. We cannot assume the trial court would have reached its decision given the unrefuted theft of this additional, significant information. This appears, at the very least, to be a very close case, one where the trial court could have ruled either way.

{¶42} We cannot give deference to the trial court's findings when those findings are based, at least in part, on a conclusion that is not supported by the record. That is, contrary to the trial court's finding, Herro did in fact improperly take the MRD information. This was not just any document; it was found by the trial court to contain detailed and important proprietary information. This case presents a classic example of conversion of privileged and confidential proprietary information by a rogue employee in partnership with his employer's competitor.

{¶43} The trial court made many conclusions. However, it is not clear whether those conclusions were affected by its failure to recognize Herro's theft of the additional highly relevant and confidential information. It is clear from the record that the information in the Second Generation document *was* used by Herro and TransAct at

14

least in some measure. There is a substantial amount of research and detail contained therein that Avery Dennison paid to have compiled.

**{¶44}** This case must be remanded for the trial court to make its findings and render its decision on the request for injunction based on the additional finding that Herro stole the Second Generation document. Only the trial court knows whether it would have drawn the same conclusions given the unrefuted theft and use of this additional information.

**{¶45}** I would reverse and remand this case to the trial court for further consideration.