[Cite as *In re Adoption of J.K.C.*, 2017-Ohio-159.]

# THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| ADOPTION OF: | : | **O P I N I O N** |
| J.K.C. | : | **CASE NO. 2016-T-0079** |

Civil Appeal from the Trumbull County Court of Common Pleas, Probate Division, Case No. 2016 ADP 0012.

Judgment: Affirmed.

*Elise M. Burkey*, Burkey, Burkey & Scher Co., L.P.A., 200 Chestnut Avenue, N.E., Warren, OH 44483 (For Appellant, Scott Douglas Criddle, Step-father).

*Kara A. Stanford*, Blair & Latell Co., L.P.A., 724 Youngstown Road, Niles, OH 44446 (For Appellee, Justin Lee Pate, Sr., Father).

COLLEEN MARY O'TOOLE, J.

{¶1} Appellant, Scott Douglas Criddle ("Step-father"), appeals from the July 14, 2016 judgment of the Trumbull County Court of Common Pleas, Probate Division, dismissing his adoption petition. Finding no error, we affirm.

{¶2} Appellee, Justin Lee Pate, Sr. ("Father"), and Amanda May Criddle ("Mother") had a son, referred to as J.K.C., d.o.b. May 17, 2006. Father and Mother never married and have lived separate and apart since 2008. Step-father and Mother

later married in 2012.  Step-father desires to adopt the minor child.  Although Mother consents to the adoption, Father does not.

{¶3}   On April 20, 2016, Step-father filed a petition to adopt the minor child. Two days later, the probate court appointed Trumbull County Children Services Board as adoption assessor.  Father filed an objection to the adoption petition on May 31, 2016.

{¶4}   The matter came before the probate court on June 27, 2016 for a hearing to determine whether the consent of Father is necessary for the adoption to proceed. Prior to taking testimony, Step-father orally amended his adoption petition to withdraw the allegation that Father's consent to the adoption is not needed because he has failed without justifiable cause to provide for the maintenance and support of the minor child as required by law or judicial decree for a period of at least one year immediately preceding the filing of the April 20, 2016 petition.  The probate court accepted Step-father's oral amendment.  Thus, Step-father had the burden to establish that Father failed without justifiable cause to provide more than de minimis contact with the minor child for a period of at least one year immediately preceding the filing of the April 20, 2016 adoption petition.

{¶5}   As stated, Mother and Father have lived separate and apart since 2008. Sometime in 2008, Mother moved from Ohio to Pennsylvania.  Father had visitation with the minor child at that time.  Mother testified on direct examination that Father came to Pennsylvania once.  In 2011, Mother filed for a name change for the minor child.  She served Father at his mother's, Joy Balut ("Joy"), house.  In response, Father appeared in Pennsylvania with an attorney.  Following a hearing, the name change petition was

2

denied. Later in 2011, Father filed for custody. There were approximately five visits with the minor child during the summer of 2011.

{¶6} In 2012, Mother and Step-father married. The couple then moved to Kentucky, where Step-father was on active duty. In the summer of 2013, Mother and Step-father moved back to Ohio. While back in town, Mother saw Father at a Niles, Ohio Speedway station. Thereafter, Mother said Father and Joy sent two gifts to the minor child at Mother's parents' address in Champion, Ohio. Mother stated the minor child received no more gifts after 2014.

{¶7} On cross-examination, Mother testified she lived in two different residences while in Kentucky. From 2013 until 2014, Mother resided in Ohio at her parents' house along with Step-father and the minor child. In October 2014, they moved to Niles. At any time between Mother's two moves in Pennsylvania, two moves in Kentucky, and two moves in Ohio, she never notified Father of any of her addresses. Mother said her parents have had the same phone number for 30 years. Mother said her cell phone number changed. However, she never notified Father of her new number.

{¶8} Mother testified that the minor child had a Facebook page but that it has been inactive since 2015. Mother stated she did not block Father or Joy from accessing that account. Mother also said to her knowledge, the minor child or Step-father did not block Father or Joy from accessing that account. Mother further said that she maintains a Facebook account and that she blocked Father from contacting her through her account.

**{¶9}** On re-direct examination, Mother testified that Father has not paid support, changed his phone number at some point, and moved. Mother tracked Father down through Joy. Mother also mentioned that Father was convicted of drug charges. Mother said that Step-father is on Facebook and that Father made no effort to contact him. She indicated that Father has had no contact with the minor child from April 20, 2015 to April 20, 2016.

**{¶10}** On re-cross examination, Mother testified that Father has not been paying support because she terminated that order.

**{¶11}** Father is a heavy equipment operator/CDL truck driver. His work is sometimes seasonal and his finances are a little depleted. Besides the minor child, Father has two other children whom he pays child support. Father said he is not internet savvy. He only uses the internet for Facebook and unemployment.

**{¶12}** Father testified on direct examination that his relationship with Mother ended "bitter" in 2008. The year following their break-up, Father, Mother, and the minor child remained in contact. Father said the last visitation with the minor child was in November 2009. Father indicated that Mother called the police on him and made recurring threats to contact the authorities, i.e., a scare tactic since he has a criminal record.

**{¶13}** Between 2009 and 2011, the minor child resided with Mother in Pennsylvania. Father called Mother's cell phone "hundreds" of times. He left messages but never received any return phone calls. In 2011, Father was served with papers from Pennsylvania to have his son's last name changed. Father hired an attorney and enjoyed five visitation periods with his son. On the last date, July 2011, Father and the

4

guardian ad litem arrived at the designated meeting spot in Pennsylvania but Mother and the minor child never showed up. Although the parties and their representatives agreed on counseling and evaluations at Father's expense, he did not have $3,000 at that time. Father later learned through "rumors" that Mother and the minor child moved from Pennsylvania to Kentucky. Mother never provided Father with a new address or phone number.

{¶14} Father said he saw Mother at the Niles Speedway in 2014. He figured she was in town visiting her family and friends. Father said, "'Good morning,'" but Mother basically looked at him and ran out the door. In reference to gifts and cards sent from Father and his family to the minor child, he stated that none were ever acknowledged.

{¶15} Father learned within the past eight or nine months before the consent hearing that the minor child was back in Ohio. Father has been saving money and has a room fully furnished for the minor child at his house. When he was involved with the court in Pennsylvania, Father was advised to only contact Mother and her parents through the guardian ad litem. Father felt that he would not be welcomed if he had shown up at Mother's parents' house looking for the minor child. Father wants to have a presence in his son's life. He believes that Mother has discouraged his efforts. Around March 2016, Father attempted to contact the minor child directly through his Facebook account by sending him a friend request but it was denied.

{¶16} On cross-examination, Father testified that he has lived at his current address in Braceville, Ohio for about one year. Prior to that, he lived with Joy. Father found out through family and friends that Mother had married Step-father. Father looked up Step-father's Facebook account but did not attempt to "friend" him. Father

5

said he is willing to pay child support for his son. On re-cross examination, Father said he has not seen the minor child in five years.

{¶17} Father's mother, Joy, testified on direct examination that she enjoyed being a grandmother. After Father's and Mother's relationship ended in 2008, Joy called Mother about ten times. Joy left messages but never received any responses. Thereafter, Mother's phone number changed and Joy had no way of phoning her. Joy sent gifts and cards to the minor child. After she became unsure where Mother actually lived, Joy began sending gifts and cards to Mother's parents' house. None of Joy's gifts or cards was acknowledged. Because there was a "bad seed" with Mother's parents, Joy did not feel welcomed to contact them directly. In fact, Joy was fearful that if she had shown up at their house, they would call the police.

{¶18} During Christmastime 2014, Joy and her fiancé, Dennis Malloy, were shopping at Sam's Club in Niles. They saw Mother. Joy figured that Mother was in the area visiting for the holidays. Joy was confident that Mother saw them. Joy attempted to approach Mother to inquire about the minor child but said that Mother walked as fast as she could towards the exit door. The next time Joy saw Mother was at a local Sheets gas station in spring of 2016. At that time, Joy had a strong suspicion that Mother was residing in Ohio because Mother was wearing a Pizza Hut work uniform.

{¶19} Also in 2016, Joy saw the minor child's Facebook page. She made a friend request but it was never accepted. When Joy went back to look at her grandson's page, it had changed. Joy said she is not internet savvy and does not know a lot about Facebook. Joy believed Father did everything he could do within the

6

resources he has to locate the minor child. Joy also believed that Mother's actions prevented Father from communicating with his son.

{¶20} On cross-examination, Joy indicated she did not realize she had rights as a grandparent.

{¶21} On re-direct examination, Joy was asked if she believed that Mother's frequent relocations made it difficult for Father to maintain contact with the minor child. Joy responded, "Not only do I believe it with every breath, I think, this is just my opinion, I believe that with every breath. I think it could have been intentional." (Consent Hearing T.p. 140).

{¶22} Lastly, Joy's fiancé, Dennis, a former deputy, testified on direct examination that he has been a part of the family since the minor child was born. Dennis referenced seeing Mother while he and Joy were Christmas shopping at the Niles Sam's Club. Like Joy, Dennis also assumed Mother was home visiting for the holidays. Dennis called Mother by name. He said Mother turned, made eye contact with him, and ran to the exit door.

{¶23} Dennis also referenced seeing Mother at the Northeast Ohio Sports Show at the Eastwood Expo Center in Niles in March 2015. Mother was with Step-father, C.G. (her oldest son), and the minor child. Dennis spoke with C.G. However, Dennis said that Mother made a gesture for Dennis to not bother them and they walked away.

{¶24} Following the hearing, on July 14, 2016, the probate court found that Step-father did not meet his burden in establishing that Father failed without justifiable cause to provide more than de minimis contact with the minor child for a period of at least one year immediately preceding the filing of the April 20, 2016 adoption petition. The court

7

further found that Father's consent is necessary for the adoption to proceed. Because Father does not consent, the court dismissed Step-father's petition to adopt the minor child. Step-father filed a timely appeal and asserts the following two assignments of error:

{¶25} "[1.] The trial court's decision finding justifiable cause for the lack of contact by appellee is against the manifest weight of the evidence.

{¶26} "[2.] The trial court abused its discretion in finding Mother prevented Father from having contact with the child because she or Appellant blocked his Facebook."

{¶27} Preliminarily, we note that Step-father's appeal focuses on the denial of his April 20, 2016 adoption petition in which he alleged that Father failed without justifiable cause to provide more than de minimis contact with the minor child for a period of at least one year immediately preceding the filing of the petition. Thus, Step-father is essentially requesting the termination of Father's parental rights. *See generally In re Adoption of Lasky*, 11th Dist. Portage Nos. 2004-P-0087, 2004-P-0088, and 2004-P-0089, 2005-Ohio-1565, ¶17 (holding that adoptions terminate fundamental rights of natural parents.)

{¶28} We commend Step-father for being involved and desiring to support his step-son. However, for the following reasons, we fail to see that the probate court committed any error in finding that Step-father did not meet his burden in establishing that Father failed without justifiable cause to provide more than de minimis contact with the minor child for a period of at least one year immediately preceding the filing of the

8

April 20, 2016 adoption petition and in requiring Father's consent with respect to Step-father's adoption petition.

{¶29} "[I]t is well established that a parent's right to raise a child is an essential and basic civil right. *In re Hayes* (1997), 79 Ohio St.3d 46, 48 * * *. The permanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case. *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, ¶14 * * *. See, also, *In re Smith* (1991), 77 Ohio App.3d 1, 16 * * *. Based upon these principles, the Ohio Supreme Court has determined that a parent 'must be afforded every procedural and substantive protection the law allows.' (Citation omitted.) *Hayes* at 49." (Parallel citations omitted.) *In re Phillips*, 11th Dist. Ashtabula No. 2005-A-0020, 2005-Ohio-3774, ¶22.

{¶30} In his first assignment of error, Step-father argues that the probate court's decision finding justifiable cause for the lack of contact by Father is against the manifest weight of the evidence.

{¶31} In his second assignment of error, Step-father alleges that the probate court abused its discretion in finding Mother prevented Father from having contact with the minor child because Mother or Step-father blocked his Facebook.

{¶32} Because Step-father's first and second assignments of error are interrelated, as they both involve Father's alleged lack of contact with the minor child, we will address them together.

{¶33} "'[T]he Supreme Court of Ohio has clarified the analysis used to determine whether judgments in civil cases are against the manifest weight of the evidence. *Eastley v. Volkman,* 132 Ohio St.3d 328, * * *, 2012–Ohio–2179, ¶12–23, (* * *). In

*Eastley,* the Supreme Court noted that most of Ohio's appellate courts applied the analysis set forth in *C.E. Morris Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279, * * *, (* * *). *Eastley* at ¶14. In *C.E. Morris,* the court held: "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris* at the syllabus. As the court in *Eastley* observed, this is the standard applicable to determining the sufficiency of the evidence underpinning a judgment. *Id.* at ¶14, * * *. The court held that the proper analysis for determining challenges to the manifest weight of the evidence is the same in civil and criminal cases, and that *State v. Thompkins,* 78 Ohio St.3d 380, * * *, (* * *) (1997) applies to both.'" (Parallel citations omitted.) *Patterson v. Godale*, 11th Dist. Lake Nos. 2014-L-034 & 2014-L-042, 2014-Ohio-5615, ¶12, quoting *Avery Dennison Corp. v. TransAct Technologies, Inc.,* 11th Dist. Lake No. 2012-L-132, 2013-Ohio-4551, ¶20.

{¶34} "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1983).

{¶35} "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact.

{¶36} "'(I)n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable

presumption must be made in favor of the judgment and the finding of facts. (* * *)'"
*Eastley, supra,* at ¶21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3 (1984), quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978).

**{¶37}** R.C. 3107.07(A) provides that consent to adoption is not required of:

**{¶38}** "(A) A parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner."

**{¶39}** [Removed 6 paragraphs]

**{¶40}** This case required the probate court to weigh the evidence to resolve the dispute over the need for Father's consent to the adoption. The probate court's determination, that Mother's interference with visitation and communication between Father and the minor child constitutes justifiable cause for Father's failure to have more than de minimis contact with the minor child for the requisite one-year period, was not against the manifest weight of the evidence. *See, e.g., In re Adoption of J.D.T.*, 7th Dist. Harrison No. 11 HA 10, 2012-Ohio-4537, ¶22-25, citing *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 367-368 (1985).

**{¶41}** Step-father seems to suggest that the probate court did not do a thorough job because it did not specifically address Father's criminal convictions in its July 14,

11

2016 judgment entry. We note that Father's criminal background was mentioned during the June 27, 2016 hearing. We further note that a parent's criminal history, including incarceration, is one of several factors a court may consider. *See, e.g., In re Adoption of J.A.B.*, 11th Dist. Trumbull No. 2013-T-0114, 2014-Ohio-1375, ¶37. Although the probate court did not specifically mention Father's criminal background in its entry, it does not mean that the court did not consider it. In reaching its decision, the probate court specifically stated the following:

{¶42} "The Court finds that the testimony of the natural father that he was ready, willing, and able to visit with his son was both credible and reliable. The Court finds that the natural father was prevented from communicating with his son by the natural mother's refusal to permit him to see the minor child absent his undergoing cost prohibitive evaluations and the natural mother's eventual move from the jurisdiction handling the case without leaving a forwarding address. In fact, the credible testimony before the Court indicates that the natural father spent several thousands of dollars to try to procure the visits with his son only to be left without a forwarding address for his son.

{¶43} "Further, the Court finds that the evidence indicates that, during those visits that the natural father managed to procure with the minor child, the minor child was discouraged from fully engaging in the visits. The Court finds the testimony of the natural mother that she did not discourage the child from interacting with the natural father to be unconvincing.

{¶44} "The Court finds that the evidence suggests that the natural mother intentionally withheld her telephone number and address from the natural father so that

he could not directly contact his son. However, the petitioner argues that the fact that the natural father had the address and telephone number for the maternal grandparents was sufficient contact information to allow him to contact his son. The evidence does not suggest a close or even friendly relationship between the maternal grandparents and the natural father after the relationship between the natural parents ended. The Court finds that the testimony shows that the natural father, with his family, sent presents to the minor child at the home of the maternal grandparents. They received no response from the natural mother, the maternal grandparents, or the child that would in any way indicate that the child had received the gifts. The natural father had no reason to believe that the minor child was residing in the home of the maternal grandparents, and, in fact, but for a brief period of time in approximately 2013-2014, the minor child did not reside with the maternal grandparents. Certainly, when the child was a resident of other states, service of a custody action filed in an Ohio Court on the maternal grandparents would have been deficient. The Court finds that knowledge of the address and telephone number of a relative of his child who likely knew where his child was, in this case, does not render the natural mother's failure to disclose the child's whereabouts to the natural father excusable.

{¶45} "The Court further finds that the credible testimony establishes that either the natural mother or the petitioner blocked the natural father from communicating with the minor child by Facebook when he attempted to do so within the one-year period in question. The testimony establishes that the adults in the minor's home have control of the security settings on the minor's Facebook page and that somebody utilized those security settings to block the petitioner from contacting the minor. The testimony of the

13

natural mother that she was not involved in the blocking of the natural father from contacting the minor on Facebook was not credible.

{¶46} "The petitioner would put the burden on the natural father to hire an investigator to try to track down the natural mother and/or his child. Given the natural mother's history of interfering with the natural father's communication and her reluctance to permit the natural father visitation, the Court finds it unlikely that even if the natural father had managed to find the minor child that he would have been given an opportunity to interact with him. A parent should not have their parental rights involuntarily terminated merely because they failed to hunt down the party who rebuffed the communication attempts that the parent had already made. *In re Adoption of S.B.D.*, 2nd Dist., 2006-Ohio-5133, ¶ 37.

{¶47} "The petitioner also argues that the natural father should have hired an attorney to file an action to compel the visitation. However, the natural father didn't even know for sure what state his son resided in. He had spent thousands of dollars and incurred a debt only recently paid off to try and obtain visitation in Pennsylvania which was no longer an appropriate venue for such an action once the natural mother packed up and moved. The Court finds that this wasn't a matter of the natural father sleeping on his right to pursue visitation but rather a situation where the natural father only recently had a known venue where he could file an action to commence a visitation proceeding. The natural father's situation was not his own doing but rather the doing of the natural mother who deprived him of his son's contact information.

{¶48} "The central question for the Court is not whether the natural father could have possibly done more to overcome the interference with visitation and

14

communication, the central question is whether there was significant interference with visitation and communication. *Id.* The Court finds that the natural mother significantly interfered with visitation and communication between the natural father and the minor child. The Court further finds that such interference constitutes justifiable cause for the failure of the natural father to have more than de minimis contact with the minor child for the requisite one year period."

{¶49} Our review of the record supports the probate court's findings that Mother's interference with visitation and communication between Father and the minor child constitutes justifiable cause for the failure of Father to have more than de minimis contact with the minor child for the requisite one year period.

{¶50} As stated, at any time between Mother's two moves in Pennsylvania, two moves in Kentucky, and two moves in Ohio, she never notified Father of any of her addresses. Mother also testified that she never notified Father of her new phone number. Mother further blocked Father from contacting her through her Facebook account.

{¶51} Father testified that his relationship with Mother ended "bitter" in 2008. Father indicated that Mother called the police on him and made recurring threats to contact the authorities, i.e., a scare tactic since he has a criminal record. Between 2009 and 2011, the minor child resided with Mother in Pennsylvania. Father called Mother's cell phone "hundreds" of times. He left messages but never received any return phone calls. In 2011, Father was served with papers from Pennsylvania to have his son's last name changed. Father hired an attorney and enjoyed five visitation periods with his son. On the last date, July 2011, Father and the guardian ad litem arrived at the

15

designated meeting spot in Pennsylvania but Mother and the minor child never showed up. Although the parties and their representatives agreed on counseling and evaluations at Father's expense, he did not have $3,000 at that time. Father later learned through "rumors" that Mother and the minor child moved from Pennsylvania to Kentucky. Mother never provided Father with a new address or phone number.

{¶52} Father said he saw Mother at the Niles Speedway in 2014. He figured she was in town visiting her family and friends. Father said, "'Good morning,'" but Mother basically looked at him and ran out the door. In reference to gifts and cards sent from Father and his family to the minor child, he stated that none were ever acknowledged.

{¶53} Father learned within the past eight or nine months before the consent hearing that the minor child was back in Ohio. Father has been saving money and has a room fully furnished for the minor child at his house. When he was involved with the court in Pennsylvania, Father was advised to only contact Mother and her parents through the guardian ad litem. Father felt that he would not be welcomed if he had shown up at Mother's parents' house looking for the minor child. Father wants to have a presence in his son's life. He believes that Mother has discouraged his efforts. Around March 2016, Father attempted to contact the minor child directly through his Facebook account by sending him a friend request but it was denied.

{¶54} Father's mother, Joy, testified that she enjoyed being a grandmother. After Father's and Mother's relationship ended in 2008, Joy called Mother about ten times. Joy left messages but never received any responses. Thereafter, Mother's phone number changed and Joy had no way of phoning her. Joy sent gifts and cards to the minor child. After she became unsure where Mother actually lived, Joy began

16

sending gifts and cards to Mother's parents' house. None of Joy's gifts or cards was acknowledged. Because there was a "bad seed" with Mother's parents, Joy did not feel welcomed to contact them directly. In fact, Joy was fearful that if she had shown up at their house, they would call the police.

{¶55} During Christmastime 2014, Joy and her fiancé, Dennis, were shopping at Sam's Club in Niles. They saw Mother. They figured that Mother was in the area visiting for the holidays. Joy and Dennis were confident that Mother saw them. They attempted to approach Mother to inquire about the minor child but said that Mother walked as fast as she could towards the exit door. The next time Joy saw Mother was at a local Sheets station in spring of 2016. At that time, Joy had a strong suspicion that Mother was residing in Ohio because Mother was wearing a Pizza Hut work uniform. Also in 2016, Joy saw the minor child's Facebook page. She made a friend request but it was never accepted. When Joy went back to look at her grandson's page, it had changed. Joy believed Father did everything he could do within the resources he has to locate the minor child. Joy also believed that Mother's actions were intentional and that Mother prevented Father from communicating with his son.

{¶56} Dennis testified that he has been a part of the family since the minor child was born. In addition to the Sam's Club sighting, Dennis referenced seeing Mother at the Northeast Ohio Sports Show at the Eastwood Expo Center in Niles in March 2015. Dennis spoke with C.G. (Mother's oldest son). However, Dennis said that Mother made a gesture for Dennis to not bother them and they walked away.

{¶57} Based on the evidence presented, the probate court's decision that Mother or Step-father had access to the minor child's Facebook page and security

17

settings and blocked Father from communicating with his son is not against the manifest weight of the evidence. In addition, the probate court's decision that Mother's interference with visitation and communication between Father and the minor child constitutes justifiable cause for the failure of Father to have more than de minimis contact with the minor child for the requisite one year period is not against the manifest weight of the evidence.

**{¶58}** Step-father's first and second assignments of error are without merit.

**{¶59}** For the foregoing reasons, appellant's assignments of error are not well-taken. The judgment of the Trumbull County Court of Common Pleas, Probate Division, is affirmed.


DIANE V. GRENDELL, J.,

TIMOTHY P. CANNON, J.,

concur.